[Crim. No. 25953. Second Dist., Div. Five. June 26, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
NATHAN NEWMAN, Defendant and Appellant.

COUNSEL

Lappen, Abelson & Harris and Robert N. Harris for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Norman H. Sokolow and William V. Ballough, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

KAUS, P. J.—A jury convicted defendant Nathan Newman of grand theft. (Pen. Code, § 487, subd. 1.) He was sentenced to prison.[1]

---

[1] The trial court first proposed probation on condition that defendant spend the first 180 days in jail, and make restitution at not less than $450 a month. Defendant rejected probation because he said that if he spent 180 days in jail, he would not have a business "to go back to." He also said he could not pay on a monthly basis; he could pay only once a year in April when he received his earnings from tax preparation.

## FACTS

In June 1972, defendant, a free lance tax accountant, obtained a loan of $85,000 from the Santa Clarita National Bank. He signed a security agreement in which he pledged stock, including 16,067 shares of Enterprise Fund stock with a then market value of $123,000. He gave the bank a single certificate for the Enterprise shares. The security agreement gave the bank a security interest in, and possession of, the stock certificate.

The first quarterly payment of $5,000 was due on September 1, 1972. In late August, defendant asked the bank for permission to sell 2,067 shares of the Enterprise stock; the remaining shares would be reissued to the bank.

On September 5, the bank sent Enterprise Fund the stock certificate, with an authorizing letter from defendant, instructing Enterprise to sell 2,067 shares and to reissue a certificate for 14,000 shares. Enterprise sent the bank a check for $14,365, which represented the proceeds of the liquidated shares. This amount was credited to defendant's account. However, the stock transfer agent for Enterprise inadvertently sent two 7,000 share certificates to defendant instead of the bank. The shares were mailed on September 19.

On November 13, the transfer agent received a letter from defendant enclosing the two 7,000 share certificates and requesting a rush liquidation of the certificates. Defendant came into the transfer agent's office in person and picked up a check for the proceeds in the amount of $99,000. The next day defendant went to a branch of the Bank of America where he deposited $75,000 into a savings account in the name of "Michael Noel" and the remaining $24,000 into his own checking account. About ten days later $47,000 was withdrawn from the Noel account and deposited into the checking account; about two weeks after that the remaining $28,000 was withdrawn and deposited into the checking account.

The loan was renewed on December 1, at which time a new note for $75,000 issued, which reflected the two $5,000 quarterly reductions.

On March 21, 1973, an annual audit of collateral by the bank revealed that the reissued certificates of Enterprise stock had never been received by the bank. A bank officer immediately called defendant and asked him

if he had received the collateral. Defendant stated, "No. I don't know what you're talking about." That day, the bank officer contacted the transfer agent and learned that the new certificates had been mailed to defendant. The bank officer again called defendant, who stated that he remembered receiving the certificates, selling them and going to Las Vegas where he lost the money gambling.[2]

The loan was later paid down to about $54,000, after defendant instructed another bank to liquidate the collateral on another loan and to pay the balance to the Santa Clarita Bank.

Defendant admitted liquidating the Enterprise Fund stock certificates but testified that he did not recall receiving the reissued certificates; he found them "laying in the file" and thought they were what was left over from over $250,000 worth of Enterprise stock he had bought earlier, particularly after a highly profitable 1971 gambling season.

## DISCUSSION

Defendant claims that the jury instructions were inapplicable and incomplete. He also argues that he did not commit "grand theft under California law."

We agree that the instructions were both incomplete and, in part, inapplicable. On the substance of the crime, the court's charge consisted of these instructions: 1. Theft "may" consist of embezzlement. (The court did not define any other form of theft.) 2. Theft requires a specific intent to defraud. (CALJIC No. 3.31.) 3. An act committed in ignorance or under a mistake of fact which disproves criminal intent is not a crime. (CALJIC No. 4.35.) 4. Embezzlement may be committed by violating section 504b of the Penal Code, which was read in full, preceded by certain Commercial Code definitions:

." 'Security Agreement'—means an agreement which creates or provides for a security interest.

" 'Security Interest'—means an interest in personal property or fixtures which secures payment or performance of an obligation.

---

[2]Defendant's version of how he disposed of the proceeds from the stock liquidation varied only slightly. He testified that he used the money or most of it to pay outstanding debts at six or eight casinos in Las Vegas.

"Where under the terms of a security agreement, . . . the debtor has the right to sell the property covered thereby and is to account to the secured party for, and pay to the secured party the indebtedness secured by the security agreement from, the proceeds of the sale of any of the said property, and where such debtor, having sold the property covered by the security agreement and having received the proceeds of such sale, willfully and wrongfully, and with the intent to defraud, fails to pay to the secured party the amounts due under the security agreement, or the proceeds of such sale, whichever is the lesser amount, and appropriates such money to his own use, [is] guilty of [theft by] embezzlement."

In effect, then, the court's instructions narrowed the charge against defendant to embezzlement, and specifically informed the jury only on the type of embezzlement defined in section 504b of the Penal Code, a section clearly inapplicable, since it refers to situations in which the debtor has the right and power to sell the security but fails to apply the proceeds of the sale in compliance with his duty to the creditor.

Nor did defendant commit embezzlement in the "orthodox" fashion. Whatever he did, it was not "the appropriation to one's own use of property delivered to him for devotion to a specified purpose other than his own enjoyment of it." (E.g., *People* v. *Hodges,* 153 Cal.App.2d 788, 793 [315 P.2d 38]; see generally, 1 Witkin, Cal. Crimes, Crimes against Property, §§ 389-392, pp. 361-364.) We assume that it was the absence of a voluntary, consensual entrustment of the shares, which caused the trial court not to give the standard CALJIC instruction on embezzlement.[3]

Before deciding whether these defects in the instructions were prejudicial, we must meet defendant's second point: that he did not commit theft, either by embezzlement or by any other known method.

■ Although we might just say that we know theft when we see it, fortunately the People have satisfied us that defendant was guilty of embezzlement because he was an involuntary trustee. They rely on *People* v. *Dubrin,* 232 Cal.App.2d 674 [43 Cal.Rptr. 60], a case that is, indeed, entirely in point.

---

[3]CALJIC No. 14.07 reads as follows: "Theft known as embezzlement consists of the fraudulent appropriation of money or other property by a person to whom it has been entrusted. The law prescribes that every trustee, broker, agent, . . . or other person entrusted with or having in his control property of another, who fraudulently appropriates it to any use or purpose not in the due and lawful execution of his trust, or secretes it with a fraudulent intent to appropriate it to such use or purpose, is guilty of theft by embezzlement."

*Dubrin* involved a fairly elaborate scheme to cheat a first trust deed holder. Boiled down, a title company inadvertently recorded a reconveyance of the first trust deed to the defendant. When the error was discovered, the defendant signed an instrument expressly acknowledging that the property involved was subject to the first trust deed, notwithstanding the reconveyance. (232 Cal.App.2d at p. 676.) Nevertheless, defendant then sold the property and pocketed all of the proceeds. (*Id.,* at p. 677.) The court held: "[I]t is clear that there was substantial evidence to support the jury's verdict that the appellant was guilty of grand theft. [¶] . . . [T]here was ample evidence to sustain the finding that he was guilty of embezzlement. At the time he received the check . . . he knew that he was not entitled to that sum of money but only to the difference between that sum and the amount still due the Bank of America upon its note. He knew that a mistake had been made and that the mistake was due to the fact, which was known to him and not to the escrow holder or the other parties to the escrow, that through mistake the bank's prior lien on the property had, so far as the public records were concerned, been extinguished, with the result that he falsely appeared to be entitled to the net proceeds of the escrow. *Where one, through mistake, receives money to which he is not entitled he becomes the trustee of that money for the benefit of the one justly entitled to it.* [Citations.] The evidence is clear that knowing of the mistake appellant appropriated monies to his own use which rightfully belonged to the Bank of America and which it would have received had the escrow holder been advised of the mistake which resulted in the reconveyance of the Bank of America's deed of trust. One who fraudulently appropriates property which has been entrusted to him is guilty of a theft. (Pen. Code, § 484.)" (*Id.,* at pp. 678-679. Italics added.)

Defendant attempts to distinguish *Dubrin,* first on its Byzantine facts and, second, by pointing out that *Dubrin* is contrary to the weight of authority which requires a voluntary entrustment for the crime of embezzlement. However, we are aware of no case which holds that only a voluntary entrustment will do, and are persuaded that *Dubrin* reflects simple common sense.

Although the jury was not instructed on the precise embezzlement theory which the evidence justified, but did receive an instruction concerning the disposal of collateral under a type of security agreement not involved in this case, we are nevertheless convinced that the court's errors of omission and commission were not prejudicial. This was a single issue case: the People proved, and defendant admitted, the

substance of the transaction. The only issue was whether when defendant liquidated the stock certificates he knew that they were the certificates which secured the loan with the bank. It was defendant's version that he did not remember receiving the stock certificates from the transfer agent and that when he discovered them in his file, he believed they were the unpledged residue of the large amount of Enterprise Fund stock he had purchased years earlier.[4]

The jury was instructed, as noted, that the crime charged requires "the specific intent to defraud . . . ." (CALJIC No. 3.31), and that an act committed "under an ignorance or mistake of fact which disproves any criminal intent is not a crime," and that "a person is not guilty of a crime if he acts. . . under an honest and reasonable belief in the existence of certain facts . . . ." (CALJIC No. 4.35.) Thus, if defendant's version raised a reasonable doubt, he could not have been convicted of anything. ■ Conversely, since the only factual issue for the jury was defendant's state of mind, having obviously resolved that issue against him, it would necessarily have convicted, even if more completely instructed. The error was therefore not prejudicial.

The judgment is affirmed.

Stephens, J., and Ashby, J., concurred.

A petition for a rehearing was denied July 16, 1975, and appellant's petition for a hearing by the Supreme Court was denied August 20, 1975.

---

[4]For the same reason we are not concerned with the issue whether, as contended by the People, the facts proved larceny as well as embezzlement. The important point is that, unless defendant's testimony that he was laboring under a mistake of fact created a reasonable doubt, theft was proved on his own testimonial admissions.